UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Margaret Temponeras, | Case No. 1:14-cv-700 |
| Plaintiff, | |
| vs. | |
| The United States Life Insurance Company of America, | |
| Defendant. | |

**ORDER**

Plaintiff Margaret Temponeras filed her complaint in this case, challenging Defendant's denial of her application for benefits under a group long term disability policy issued by the Defendant. (Doc. 1)  The parties have each filed motions seeking entry of judgment on the administrative record (Docs. 28 and 29), which are fully briefed and ready for decision.  For the following reasons, the Court will grant Defendant's motion and deny Plaintiff's motion.

**FACTUAL BACKGROUND**

Margaret Temponeras is a physician and was employed by Unique Pain Management, LLC ("Unique"), a chronic pain medicine practice.  Unique maintained a long term disability insurance plan for its eligible employees that was issued by Defendant, the United States Life Insurance Company of America ("U.S. Life").  Unique was required to pay regular monthly premiums in order to keep the policy in force.  Temponeras became an insured employee under the policy on May 1, 2009.  (Doc. 20-3, PAGEID 408)  The LTD policy defines "physician" as a medical practitioner licensed in the state where she performs medical services, and acting within the scope of that

license.  (Id. at PAGEID 413)

Unique's premium check to U.S. Life for the month of June 2011 was returned by its bank as non-negotiable.  U.S. Life's third-party processor, Allied National, Inc., wrote to Unique on June 16, 2011, notifying it of the non-payment and asking Unique to remit the monthly premium (plus a $25 handling fee) by July 1, 2011.  If payment was not received by that date, the LTD policy coverage would lapse as of June 1, 2011 without further notice.  (Doc. 20-2, PAGEID 356)  Unique failed to send its payment, and Allied National cancelled the policy effective June 1, 2011.

Dr. Temponeras contends that she stopped work on May 19, 2011 due to long-standing chronic conditions of narcolepsy and cataplexy.  The American Sleep Association defines narcolepsy as "a chronic neurological disorder caused by the brain's inability to regulate a stable sleep-wake cycle."  It defines cataplexy as "a sudden loss of muscle tone that causes feelings of weakness and loss of voluntary muscle control."  Cataplexy typically occurs as a second common symptom of narcolepsy (the first being excessive daytime sleepiness).[1]  Temponeras concedes that she was not receiving medical treatment for these conditions at that time, or for several years prior to that.  She argues that standard narcolepsy treatment (use of stimulants) was not available to her, because they caused cardiac problems when she tried them several years ago.  While she apparently was able to practice medicine up to May 19, 2011, she asserts that on that date her narcolepsy prevented her from safely continuing to do so due to her uncontrolled tendency to fall asleep.

---

[1] See https://www.sleepassociation.org/patients-general-public/narcolepsy-cataplexy/, last accessed May 3, 2016.

On May 17, 2011, two days before Dr. Temponeras asserts that she ceased working due to a disability, the federal Drug Enforcement Administration personally served on her a notice of immediate suspension of her certificate of registration to prescribe controlled substances. The DEA also conducted a search of Unique's office the same day, and seized its records and inventory. See Temponeras v. State Medical Board of Ohio, 2014-Ohio-225 (Ohio 10th Dist. App., January 23, 2014), citing the DEA's show cause order. In that case, the Ohio Court of Appeals affirmed the State Medical Board's January 11, 2012 decision to indefinitely suspend Dr. Temponeras' medical license.

Dr. Temponeras completed an application for LTD benefits under Unique's plan on April 18, 2012. (Doc. 20-3, PAGEID 375-376) She claimed she was disabled on May 19, 2011 due to narcolepsy and breast cancer (for which she underwent surgery in 2006). She identified Dr. Peter Tsai as her primary attending physician, and also listed Dr. Malik and two other providers from whom she had received treatment from 1998 to 2005. Dr. Tsai completed an Attending Physician's Statement form on April 13, 2012, stating that he first saw Dr. Temponeras on September 20, 2011, with subsequent visits approximately once a month through April 2012. In a box asking for the "date you advised the patient to cease/and or modify work activity," Dr. Tsai wrote: "9-20-11 retroactive to 5-19-11." (Id., at PAGEID 398) He opined that Dr. Temponeras' "narcolepsy cannot be treated due to heart condition." Typical medications prescribed for that condition are "contraindicated and may be lethal if taken again.[2] Patient cannot

---

[2] Her prior medical records showed that Temponeras was prescribed stimulants to treat her narcolepsy but suffered incidents of tachycardia. She was advised to

work as physician in present field due to danger treating patients and writing prescription if falls asleep constantly even while standing [sic]." (Id., at PAGEID 399)

U.S. Life denied Temponeras' claim in a June 29, 2012 letter. (Doc. 20-3, PAGEID 431-434)   After reviewing the medical records provided by Dr. Tsai, U.S. Life's letter explained:

> Information obtained through an internet search shows your current Doctor of Medicine licenses status as inactive.  Actions taken in regard to your license include a citation issued in June 2011 and a Board Order of Indefinite License Suspension effective January 27, 2012.  As of February 10, 2012 the Board's order is under an appeal review. To be eligible for coverage under the Policy you must be in an eligible Occupational Class. This is defined in the Schedule of Benefits as noted above.
>
> Your occupational class is that of a Doctor of Medicine. The Policy includes a listing of circumstances under which coverage under the Policy is deemed to end, as documented above. Considering the suspension of your license, you were no longer in an eligible class for coverage under the Policy as far back as 2011, when the citation was issued. Information on file further indicates that premiums on the Policy were only paid through June 1, 2011. We do not have medical evidence to support that your disability commenced while in an eligible occupational class and therefore while covered under the Policy.
>
> Furthermore, based upon a complete review of your file, the information does not support disability under the Long Term Disability Plan as of May 19, 2011. There is no information on file that establishes you were disabled from May 19, 2011, through the 90 day Waiting Period and beyond. There is no clinical documentation available from March 23, 2007 until a January 20, 2012 note from Dr. Tsai. The information on file does not clinically establish a change in your condition as of May 19, 2011. The provided clinical information does not substantiate clinical impairments, restrictions or limitations that would prevent you from performing the material duties of your regular job throughout your Plans elimination period and beyond.

(Id. at PAGEID 434)

---

discontinue the stimulants, and her cardiac problems subsided.

The policy's claim procedures required any appeal of this initial decision to be made in writing within 180 days after receipt of the letter.  Temponeras filed a formal written appeal, through counsel, on December 20, 2012.  (Doc. 20-1, PAGEID 152-159) With her appeal letter, she submitted additional medical records from Dr. Tsai, including the office note from her initial visit with him on September 20, 2011, and a note dated November 21, 2011.  Dr. Tsai wrote then that he first saw Dr. Temponeras on September 20, 2011, "but her disabling condition is a preexisting condition that became unbearable on May 19, 2011."  (Doc. 20-1, at PAGEID 170) Temponeras also submitted a report from Dr. Juniad Malik, a pulmonary specialist, who performed an independent medical examination on Temponeras on January 26, 2012 (which was apparently requested by a different insurance company, Ohio National).  Dr. Malik reviewed her medical history and present physical status, and concluded that she has narcolepsy with cataplexy.  He opined that she cannot perform the substantial and material duties of her profession due to those conditions.  (Doc. 20-1, at PAGEID 181-185) She also submitted older records concerning her initial diagnosis of narcolepsy and her treatment for breast cancer.  Her appeal letter reviewed these records, and asserted that "by May 19, 2011, Dr. Temponeras' condition had become unbearable and she was unable to perform the material duties of her occupation due to the narcolepsy and cataplexy.  On September 20, 2011, Dr. Temponeras was examined by Peter Tsai, M.D.  Dr. Tsai confirmed Dr. Temponeras' conditions of narcolepsy and cataplexy."  (Id. at PAGEID 153-154)

She further argued that contrary to U.S. Life's assertion, she was in an eligible occupational class on May 19, 2011 for purposes of the policy's definition.  The Ohio

Medical Board's June 8, 2011 citation to her was simply a notification of charges, and was not a formal suspension of her state medical license.  The suspension of her DEA registration on May 17 prevented her from prescribing controlled substances, but did not prohibit her from otherwise practicing medicine.  And in response to U.S. Life's observation about her lack of medical care before September 2011, she noted that her narcolepsy was well-documented and long-standing, and that all of her doctors agree that there is no available treatment for her due to her cardiac history.  She argued that the policy's requirement of "regular care of a physician" is meaningless in her case, because there is no "regular" care available for her condition, and any ambiguity in that phrase as applied to her must be resolved in her favor.

Finally, Temponeras noted that U.S. Life failed to provide any documentation to support its assertion that the Unique plan had lapsed as of June 1, 2011.  She stated that U.S. Life sent a letter to Unique on November 26, 2012, offering assistance in preparing tax forms for its employees, a service U.S. Life offers to all of its disability insurance customers.  She argued that this letter contradicted U.S. Life's position that the policy had lapsed.

U.S. Life acknowledged her appeal, and referred the matter for an outside peer review by Dr. James Caplan, a pulmonary and critical care specialist.  While the appeal was pending, Temponeras notified U.S. Life that she had been awarded Social Security Disability benefits, based on a date of disability onset of February 28, 2012.  (Doc. 20-2, PAGEID 289)  Dr. Caplan's final report was received by the U.S. Life claims group on March 13, 2013.  (Doc. 20-2, PAGEID 347-352)  Caplan identified all of the documents he had reviewed, which included the medical records from Dr. Tsai and Dr. Malik, and

Temponeras' correspondence to U.S. Life.  He also spoke directly to Dr. Tsai on February 5, 2013.  During that conversation, Dr. Tsai confirmed that "the patient's last day of work was decided by the patient."  He also confirmed that there were no medical records provided or available from May 19, 2011 through September 20, 2011, the date of Temponeras' first visit with Dr. Tsai.  Dr. Tsai's office note from that visit states that Temponeras came to see him about "... disability, she has had 3 major breast cancer surgeries in the past. ... Pt is disabled because of inability to work anymore ... disability has become too much to work for now.  Pt cannot take medicine because of heart condition."  (Doc. 20-2, PAGEID 343-344)

Dr. Caplan agreed that Temponeras' narcolepsy and cataplexy rendered her disabled as of September 20, 2011, and that she would not be able to work as a physician due to her conditions.  But he observed: "While it may well be that the patient was unable to work since May 19, 2011, there are no supportive medical documents submitted for my review to support this date."  (Id., at PAGEID 350)   He concluded that Temponeras is disabled, but that "the date of disability is open to question and somewhat arbitrary.  There is no evidence to support the date in question as opposed to any other date."  (Id., at PAGEID 347)

On March 20, 2013, U.S. Life rejected Temponeras' appeal, concluding that "Dr. Temponeras' period of disability did not commence while the Employer's LTD Policy was in force.  Therefore, we are reaffirming the previous decision to deny the LTD claim."  (Doc. 20-2, PAGEID 361) U.S. Life cited the June 16, 2011 letter from Allied National to Unique, notifying it of non-payment of its premium.  Allied National was subsequently informed that Unique had gone out of business, and it terminated the

policy because Unique was no longer an eligible employer group.  U.S. Life cited an Allied Life internal record of a telephone call on June 22, 2011 from Wayne "Birch" (presumably Wayne Burge, identified in the June 16 letter as Unique's insurance agent).  The record states that Mr. Burge called Allied about the overdue premium payment of $301 that was requested in the June 16 letter.  Burge stated that Unique has "... been forced out of business and are too mad to send a letter stating that they need to cancel policy.  Government has closed them.  So please cancel."  (Doc. 20-2, PAGEID 357)  On July 8, 2011, a Notice of Termination of Coverage was sent to Unique and to Mr. Burge, stating the policy had lapsed as of June 1, 2011.  (Doc. 20-2, PAGEID 358)  Therefore, Temponeras would have to establish that she was disabled before June 1, 2011 in order to be entitled to any policy benefits.

U.S. Life relied on Dr. Caplan's opinion to conclude that the medical evidence did not support her claim that she was disabled prior to June 1.  U.S. Life acknowledged that she was disabled as of September 20, 2011, but the policy was not in effect on that date.  Dr. Tsai confirmed to Dr. Caplan that it was the patient (Temponeras) who decided the last day on which she worked (May 19, 2011), and that no medical records or other evidence supported that date as opposed to some other date.  U.S. Life stated that this decision was final, and that Temponeras had exhausted the administrative review procedures.

Temponeras filed her complaint in this case on September 4, 2014, pursuant to 29 U.S.C. §1132(a), seeking a judgment awarding her benefits under the policy due to disability based on narcolepsy.

**ANALYSIS**

An ERISA plan administrator's decision regarding plan benefits is generally reviewed by the Court de novo. However, if the written plan grants the administrator discretion to make such decisions, the Court reviews the final administrative decision under the arbitrary-and-capricious standard. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Under that less demanding review, the court "... will uphold a plan administrator's decision if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Balmert v. Reliance Standard Life Ins. Co., 601 F.3d 497, 501 (6th Cir. 2010)(internal quotations and citations omitted).

U.S. Life cites a term of the policy that grants it "sole discretionary authority, as Claims Administrator/Insurer, to determine eligibility, make all factual determinations and to construe all terms of the policy/plan." (Doc. 20-3, PAGEID 427) Temponeras responds that this provision is not a term of the policy, but appears in a document titled "Addendum to Summary Plan Description." She argues that in CIGNA Corp. v. Amara, 563 U.S. 421 (2011), the Supreme Court held that a Summary Plan Description ("SPD") is not a plan document and should not be treated as a part of an ERISA-covered plan or policy. U.S. Life contends that in this case, the SPD and the Certificate of Coverage constitute the entirety of the plan documents and must be considered as a whole. It cites Maynard v. Prudential Ins. Co. of Am., 2013 U.S. Dist. LEXIS 159648 (N.D. Ohio, Nov. 7, 2013), where the district court held that a long-term disability insurance certificate and the SPD that were distributed to all employees were "plan documents" that clearly disclosed the administrator's discretionary authority to determine coverage. But in that case, the Certificate of Coverage and the SPD both contained terms

-9-

expressly granting discretionary authority to the administrator. There was no conflict between the two documents.

Temponeras cites Shoop v. Life Ins. Co. of N. Am., 839 F.Supp.2d 830 (E.D. Va. 2011), where a life insurance policy did not contain any language conferring discretionary authority on the insurer. But an SPD given to employees (and which described a variety of employee benefit plans) granted discretionary authority to the insurer to interpret policy terms and determine benefits eligibility. Applying Amara, the district court held that the policy terms control over any conflicting terms in the SPD, and applied a de novo standard of review to the benefits decision. The court also noted that the SPD was not irrelevant to such a review, because an SPD may properly be considered as extrinsic evidence in determining disputes about the meaning of policy terms. Id. at 837.

The record in this case contains the "Certification of Coverage" issued to Unique, and confirming coverage for Temponeras effective May 1, 2009. (Doc. 20-3, PAGEID 408-426) The Certificate states that coverage is subject to the requirements of the group policy between U.S. Life and Unique, which may be changed or terminated without notice to or consent of any insured person. The group policy itself is not in the record, and the Certificate does not include language granting discretion to U.S. Life. Following the Certificate is the document entitled "Addendum to Summary Plan Description," which states that it is a "portion" of the SPD required by ERISA. As noted above, this Addendum states that U.S. Life "is granted sole discretionary authority, as Claims Administrator/Insurer, to determine eligibility, make all factual determinations and to construe all terms of the policy/plan." (Id. at PAGEID 427) U.S. Life argues that

the documents in the record constitute the entire policy, but that plainly is not the case.

Because the only language conferring discretionary decision-making authority is found in an "Addendum" to an SPD, this Court will apply the de novo standard of review. This standard requires the Court to confine its review to the administrative record and determine whether the plan administrator made "a correct decision" without according the administrator any deference or presumption of correctness. Lipker v. AK Steel Corp., 698 F.3d 923, 928 (6th Cir. 2012)(internal citation omitted). The Court applies general contract law principles to disputes over policy provisions. Unambiguous terms are accorded their plain and ordinary meaning, while extrinsic evidence may be used to construe ambiguous terms. Id. Any ambiguity is construed against U.S. Life, the drafter of the policy at issue here.

The disability policy's section entitled "Long Term Disability Benefits" states:

If, while insured, you become disabled and continue to be so disabled past the waiting period, United States Life will pay to you the benefits described below.

The waiting period is shown in the Schedule of Benefits.[3]

**DEFINITIONS**

TOTAL DISABILITY means:

  - during the waiting period and next 24 months, your complete inability to perform the material duties of your regular job; "your regular job" is that which you were performing on the day before total disability began.

  - after such 24 months, your complete inability to perform the material

---

[3] The policy defines "waiting period" as "A period of consecutive days of disability for which no benefit is payable. ... The waiting period begins on the first day of disability occurring after the effective date of your insurance." (Doc. 20-3 at PAGEID 413) The waiting period for Unique's policy is 90 days. (Id. at PAGEID 408)

> duties of any gainful job for which you are reasonably fit by training, education or experience.
>
> The total disability must be a result of an injury or sickness. To be considered totally disabled, you must also be under the regular care of a physician.

(Doc. 20-3 at PAGEID 415)

Temponeras cites U.S. Life's concession that her diagnosed narcolepsy rendered her disabled as of September 20, 2011, when she first consulted Dr. Tsai. U.S. Life's medical consultant, Dr. Caplan, agrees with Dr. Tsai that as of that date, Temponeras could not perform the material duties of a physician. But the policy's definition of "total disability" also requires that an insured be "under the regular care of a physician." Temponeras was not under the care of any physician for at least four years before her claimed disability onset date of May 19, 2011. She argues that there is no recognized treatment for her condition, as the only standard therapy (stimulants) is contraindicated for her due to her cardiac history. Since being under the "regular care of a physician" would be futile for her, she contends that U.S. Life wrongly enforced that policy provision against her. She cites several ERISA cases rejecting insurers' reliance on similar provisions, in the absence of evidence that regular care would help treat the insured's condition. See, e.g., Radford Trust v. First Unum Life Ins. Co. of America, 321 F.Supp.2d 226 (D. Mass. 2004); and Walke v. Group Long Term Disability Ins., 256 F.3d 835 (8th Cir. 2001).

The cases Temponeras relies on are distinguishable on their facts and the policy language at issue. In Radford Trust, for instance, the insurer denied benefits after determining that plaintiff was not disabled prior to the date he ceased working (and his

-12-

coverage ended). Plaintiff consulted a physician on June 22, 1999, who diagnosed schizophrenia and depression. In his subsequent benefit application, he stated that his symptoms had become acute in April 1999, such that he could not perform his duties as an associate lawyer in a law firm. His employer submitted a statement to the insurer that it informed plaintiff on April 26, 1999 that he was being terminated and should look for another position; but other evidence in the record, including his time sheets during May and June 1999, supported plaintiff's argument that he continued to work for the firm through the end of June. The insurer did not dispute that plaintiff had been terminated due to his inability to handle his workload, poor attention and concentration, and diminished social interactions, all recognized symptoms of acute schizophrenia. In addressing the insurer's reliance on the fact that plaintiff did not consult a physician until after he was informed of his termination, the district court stated:

> Regular attendance of a physician was in no way built into the [policy's] definition of "disability" or "disabled." Even the provision relating to proof that regular attendance of a physician was required distinguished between that requirement and proof of disability; it stated that First UNUM would provide benefits when it "receives proof that an insured is disabled ... and requires the regular attendance of a physician." It is worth noting that the provision did not even require proof that a physician visit had occurred, but simply a demonstration that the condition was severe enough to "require" such visits.

Id. at 244-245. It is clear from this discussion that the language of the disability policy at issue in Radford Trust differed significantly from Unique's policy, where the requirement of "regular care of a physician" is a part of and built into the U.S. Life policy's definition of "total disability."

And in Walke v. Group Long Term Disability Ins., plaintiff was awarded disability benefits in September 1994 after he was hospitalized the previous June for ventricular

tachycardia.  He tried to return to work as a hospital administrator, but was unable to perform his duties and resigned.  In April 1996, the plan requested proof of continuing disability.  His physician reported that Walke remained under his care and was taking two prescribed medications, but he had not been seen in the office since November 1995.  He also stated that Walke "has the physical capacity to perform medium work, but he has a history of stress-related ventricular tachycardia and chronic anxiety disorder."  The physician opined that it would be detrimental to Walke's health to return to his former position.  The insurer terminated benefits, finding he was no longer disabled from a cardiac standpoint, and because he was not under the regular care of a physician.  The court of appeals affirmed the district court's reversal of that decision.  His physician had unambiguously stated that Walke **was** under his care and **was** taking medications that he had prescribed.  The court also noted that the insurer had no evidence "that additional doctor visits would have influenced the progression of [Walke's] disability."  Id. at 841.  But in this case, the question is not what kind of evidence Temponeras might need to establish that she remained disabled, or how often she might need to see a physician in order to satisfy the requirements of continuing disability.  As she states several times, the only question here is **when** she first became disabled for purposes of the U.S. Life policy.  That policy clearly requires evidence of regular medical care in order to establish disability in the first instance.

Nor is this policy term meaningless or ambiguous, by requiring a patient to receive medical treatment even if she demonstrates that there is no treatment available, as Temponeras suggests.  The "regular care" requirement allows the administrator to

review a claim of total disability on the basis of objective medical evidence in the records of the physician, or the results of tests the physician may have ordered or administered. Temponeras argues that her treating physician opined that she became disabled as of May 19, 2011, and that U.S. Life has no basis to reject that opinion. But ERISA administrators are not required to accept treating physicians' opinions or accord them controlling weight (as is the case with Social Security disability reviews). "[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003). In that case, the Supreme Court concluded that nothing in ERISA "... suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." Id. at 831. Of course, it is also true that plan administrators "may not arbitrarily repudiate or refuse to consider the opinions of a treating physician." Glenn v. MetLife, 461 F.3d 660, 671 (6th Cir. 2006). U.S. Life cites Sixth Circuit cases noting that a lack of objective medical evidence is a sufficient reason for an administrator to reject a treating physician's opinion. For instance, in Curry v. Eaton Corp., 400 Fed. Appx. 51 (6th Cir. 2010), the court of appeals affirmed the administrator's decision to deny continuing disability benefits to plaintiff, even though her treating physicians opined that she remained disabled and unable to perform even sedentary work. The court stated that while "... ERISA and federal regulations under the Act require "full and fair" assessment of claims and clear communication to the claimant of the specific reasons for benefit denials[,] ... these measures do not command plan administrators to credit the opinions of treating physicians over other

evidence relevant to the claimant's medical condition. ... To that extent, a lack of objective medical evidence upon which to base a treating physician's opinion has been held sufficient reason for an administrator's choice not to credit that opinion." Id. at **20 (internal citations and quotations omitted).

In Disanto v. Wells Fargo & Co., 2007 U.S. Dist. LEXIS 62781 (M.D. Fla. Aug. 24, 2007), the district court discussed the importance of objective medical evidence in benefits determinations, even when the plan lacks a specific or express requirement for submission of such evidence. The court noted: "Were an opposite rule to apply, LTD benefits would be payable to any participant with subjective and effervescent symptomology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional. In the absence of a requirement of objective evidence, the review of claims for long-term disability benefits would be meaningless because a plan administrator would have to accept all subjective claims of the participant without question." Id. at *24-25 (internal citations and quotations omitted).

The importance of this observation is well illustrated in this case. Temponeras was originally diagnosed with narcolepsy in 1999, yet apparently she was able to work thereafter for many years, and certainly from May 1, 2009 to May 17, 2011. She claims that U.S. Life should have granted benefits because she went to Dr. Tsai four months after her practice closed and told him that she stopped working due to narcolepsy. The Court finds nothing in the terms of the U.S. Life Certificate of Coverage that would require payment of benefits simply because months after the fact, she reports to a doctor that she had to stop working, even if she identifies a chronic condition as the

reason.

Cases that Temponeras relies on to argue that U.S. Life should have given Dr. Tsai's opinions retroactive effect are distinguishable. For example, in Thompson v. Standard Ins. Co., 167 F.Supp.2d 1186 (D. Ore. 2001), an accountant with a history of prior knee and back surgeries began experiencing knee and back pain and stiffness in 1994. By January 1997, he could not work full-time and had reduced his hours significantly, which apparently terminated his disability coverage under his firm's plan. From 1994 on, he was being regularly evaluated and treated by his physicians in areas of primary care, orthopedics, rheumatology, and psychiatry. He applied for LTD benefits in May 1998, which were denied. One of the insurer's arguments in defending that decision was that evidence that post-dated the termination of his coverage (January 18, 1997) was irrelevant to the question of whether plaintiff was disabled on or before that date. The district court rejected this argument, noting that the same doctors who signed statements attesting to his disability in May 1998 had opined that he was disabled by arthritis as early as July 1996, and the effects of his arthritis worsened to the point that he had to stop working full-time by January 1997. Their opinions were supported by objective medical evidence, including well-documented clinical signs, symptoms, and testing throughout that period.

Similarly, in Delisle v. Sun Life Assur. Co., 558 F.3d 440 (6th Cir. 2009), also cited by Temponeras, plaintiff was in two successive car accidents that left her with back injuries and a closed head injury. She continued to work thereafter, while receiving regular care from three physicians (a neurosurgeon, an osteopath, and a licensed cognitive behavioral therapist). She was terminated two years after the second

accident, and eight months later filed a claim for disability benefits.  The Sixth Circuit held the administrator's denial of her claim was arbitrary and capricious on several grounds, including its reliance on the fact that she continued to work after her accident, and filed a disability claim only after she was fired.  Temponeras cites the Sixth Circuit's observation that "there is no logical incompatibility between working full time and being disabled from working full time."  Id. at 448 (quoting Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 918 (7th Cir. 2003)).  But there, as in Thompson, the chronic and increasingly more serious effects of plaintiff's head and back injuries were well documented by her treating physicians, who regularly saw her throughout the period that preceded her termination and her benefit application.  Those effects also contributed to the termination of her employment.

    The record in this case lacks any comparable evidence documenting Temponeras' total disability - her "complete inability to perform the normal duties of your regular job" - prior to the termination of Unique's disability coverage on June 1, 2011.  She argues that simply because a claimant continues to work despite her disability, even up to the date on which her employment is terminated, does not mean that she was not disabled prior to that date.  Again, the cases she relies on involve documented medical evidence of that pre-existing disability and, typically, documented difficulties in maintaining employment because of the disability.  There is an utter lack of such evidence in this case.  U.S. Life is not required to accept her assertion that Dr. Tsai's September 20, 2011 opinion should "relate back" to the date she claims she could no longer work **because of that disability**, in the absence of any objective or contemporaneous evidence of any kind in the record to support her assertion.

For all of these reasons, the Court grants U.S. Life's motion for entry of judgment on the administrative record (Doc. 28), and denies Temponeras' motion (Doc. 29). The complaint is dismissed with prejudice.

    SO ORDERED.

    THIS CASE IS CLOSED.

DATED: May 5, 2016                                    <u>s/Sandra S. Beckwith</u>
                                                             Sandra S. Beckwith, Senior Judge
                                                             United States District Court